UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

CFMOTO POWERSPORTS INC.,            Civil No. 09-2202 (JRT/JJK)

           Plaintiff,

v.                                      **MEMORANDUM OPINION AND ORDER**

NNR GLOBAL LOGISTICS USA, INC.,

           Defendant.

---

Boris Parker and Nicholas M. Wenner, **PARKER & WENNER**, 220 South Sixth Street, Suite 1700, Minneapolis, MN 55402, for plaintiff.

Dawn C. Van Tassel and Jason A. Lien, **MASLON EDELMAN BORMAN & BRAND, LLP**, 90 South Seventh Street, Suite 3300, Minneapolis, MN 55402, for defendant.

Plaintiff CFMOTO Powersports, Inc. ("CFMOTO") imports and distributes small motor vehicles from China into the United States. In March 2008, CFMOTO and defendant NNR Global Logistics USA, Inc. ("NNR") agreed that NNR would manage the logistics of CFMOTO's shipping and importing business. In the spring of 2009, CFMOTO fell behind on payments to NNR for outstanding shipping and warehousing invoices. After NNR notified CFMOTO that it was placing a lien on CFMOTO's warehoused vehicles until CFMOTO satisfied its due and payable costs, CFMOTO filed this action in the District of Minnesota. CFMOTO alleges claims for, *inter alia*, breach of contract and conversion, and seeks injunctive relief. The case is now before the Court on NNR's motion to dismiss or transfer for improper venue, and CFMOTO's motion for

a preliminary injunction. For the reasons set forth below, the Court grants NNR's motion and transfers the case to the Northern District of Illinois, Eastern Division. The Court denies without prejudice CFMOTO's motion, but orders that the Temporary Restraining Order remain in effect until further adjudication by the transferee court.

## BACKGROUND

CFMOTO imports scooters, motorcycles, and ATVs from a manufacturer in China. CFMOTO then sells the vehicles in the United States to the public through a network of dealers. NNR is a non-vessel-operating common carrier providing international air and ocean cargo, customs brokerage, logistics, warehousing, and domestic transportation to its customers. In March 2008, NNR and CFMOTO agreed that NNR would manage the logistics of importing and warehousing CFMOTO's vehicles.

NNR's foreign office dealt directly with CFMOTO's manufacturer to coordinate the shipment of vehicles into the United States. NNR was responsible for clearing the vehicle through customs under the authority of a Customs Power of Attorney. NNR then delivered the vehicles to the one of five warehouses across the United States. CFMOTO selected third-party warehouses operated by RIM Logistics, Ltd. ("RIM") to store some CFMOTO products until they were transported to dealers.[1] When CFMOTO agreed to sell vehicles to dealers, CFMOTO sent orders to the storage warehouses, requesting that

---

[1] The RIM warehouses are located in California, Florida, and New Jersey. NNR offered additional warehouse space in Eagan, MN, to accommodate CFMOTO's local storage needs. CFMOTO also has an independent warehouse in Dallas, Texas.

the vehicles be shipped to a dealer.  In such circumstances, either CFMOTO handled the shipment directly or CFMOTO used a third party secured by NNR.  NNR billed CFMOTO on 30-60 day payment terms, billing CFMOTO separately for freight shipping charges and for any transportation costs from the warehouse to the dealer.  Once a month, NNR also "passe[d] on" to CFMOTO the costs of warehousing, adding a slight mark-up.

In 2009, CFMOTO experienced a significant decrease in its vehicle sales.  By that time, however, CFMOTO had already commenced the import of approximately 4000 new vehicles, which NNR delivered to warehouses.  Because of CFMOTO's precarious financial condition, it has paid NNR for shipping and transportation costs for only 2347 of those vehicles.  The shipping and transportation costs for 1436 vehicles remain due and owing to NNR.

In the summer of 2009, NNR demanded to be paid in full for the outstanding charges, although the exact amount owed is disputed.  On August 14, 2009, NNR notified CFMOTO that it was refusing to release any inventory to dealers until CFMOTO paid NNR in full.  Specifically, NNR claimed that it was asserting various liens on the currently warehoused vehicles.  CFMOTO asserts that it cannot pay NNR unless it is able to sell that inventory.

On August 18, 2009, CFMOTO terminated NNR's services and revoked all contracts with and authorizations held by NNR.  CFMOTO brought this action, alleging that NNR is wrongfully withholding approximately $6,200,000 of CFMOTO inventory as collateral for the amounts NNR claims are due and owing.  CFMOTO claims that it owes no more than 6.5 percent of that inventory value.

On August 31, 2009, the Court entered a Temporary Restraining Order reflecting the parties' stipulated agreement regarding the release of CFMOTO vehicles from NNR-controlled warehouses. (Docket No. 22.) NNR has filed a motion to dismiss for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3), arguing that a forum-selection clause in the parties' agreements mandates that all disputes between the parties be venued in the state and federal courts in Cook County, Illinois. CFMOTO has also filed a motion for preliminary injunction, requesting that the Court enter an order enjoining NNR from interfering with CFMOTO's access to vehicle inventory at its warehouses and preventing NNR from offering for sale or otherwise disposing of the inventory to satisfy NNR's claimed lien.

## DISCUSSION

**I. NNR'S MOTION TO DISMISS FOR IMPROPER VENUE**

Federal Rule of Civil Procedure 12(b)(3) [2] allows a party to move to dismiss an action when the action is not filed in the proper venue. Fed. R. Civ. P. 12(b)(3). Here, NNR contends that this case is improperly venued in the District of Minnesota because a forum-selection clause in the parties' agreements requires the parties to bring all legal

---

[2] The Eighth Circuit has not definitively decided the question of whether a motion to dismiss pursuant to a forum-selection clause is properly brought under Federal Rule of Civil Procedure 12(b)(3) or 12(b)(6). *Rainforest Cafe, Inc. v. Eklecco, L.L.C.*, 340 F.3d 544, 545 n.5 (8th Cir. 2003). District courts in this circuit, however, have determined that a 12(b)(3) motion is a proper vehicle by which to challenge venue under a forum-selection clause. *Tockstein v. Spoeneman*, No. 4:07CV00020, 2007 WL 3352362, at *2 (E.D. Mo. Nov. 7, 2007). "Therefore, the Court may properly consider and rely upon facts outside the pleadings without converting the motion into one for summary judgment." *Id.*

actions arising out of their business agreement in the federal and state courts located in Cook County, Illinois. CFMOTO responds that the forum-selection clause was not a term of the parties' agreements, either initially or based on invoices NNR later sent to CFMOTO. The parties dispute which of three sets of documents provided the terms and conditions governing the parties' business relationship: The Customs Power of Attorney and accompanying Terms and Conditions of Service; the NNR Import Proposal provided to CFMOTO, and invoices sent by NNR to CFMOTO.

> **A.  The Forum-Selection Clause Was a Term of the Parties' Agreement Under the Terms and Conditions of Service Accompanying the Customs Power of Attorney.**

"The key question to determining whether venue is proper is whether the parties agreed to the forum selection clause." *BTC-USA Corp. v. Novacare*, Civil No. 07-3998, 2008 WL 2465814, at *3 (D. Minn. June 16, 2008). NNR contends that CFMOTO assented to the forum-selection clause when the parties initially agreed to enter into business together. On March 19, 2008, Lev Mirman, the President of CFMOTO, signed a form entitled "Customs Power of Attorney and Acknowledgement of Terms and Conditions of Service" (the "Customs POA"), which granted NNR authority to act on CFMOTO's behalf to import and transport goods through "customs territory." (Bjork Decl., Docket No. 18, ¶ 3 & Ex. 2.) The Customs POA further stated that CFMOTO "acknowledges receipt of NNR's Terms and Conditions of Service governing all transactions between the Parties." (*Id.*)

NNR asserts that NNR account executive Michael Bjork personally provided NNR's Terms and Conditions of Service to Mirman on a separate page at the time Mirman executed the Customs POA. (*Id.*) Those terms and conditions state in relevant part:

> 2. **CHOICE OF LAW/VENUE/JURISDICTION**. These terms and conditions, and any act or contract to which they apply, shall be governed and interpreted by the laws of the State of Illinois, United States of America, without reference to its choice of law provisions. The shipper, consignee, importer and owner agree that any and all legal actions brought by any of them (regardless of whether based on a contract, tort, statute, or in equity or otherwise) regarding or relating to the transportation, import, export, entry, warehousing or other handling, expenses and charges of or for the shipment(s) which are the subject of this invoice, or their relationship to NNR, **shall be exclusively brought in the state or federal courts in Cook County, Illinois, United States of America**. The shipper, consignee, importer and owner hereby irrevocably agree that said courts are an appropriate and convenient forum for the resolution of all claims and irrevocably consent to the personal and subject matter jurisdiction of the state and federal courts located in Cook County, Illinois, United States of America.

(*Id.*, Ex. 1 (emphasis added).)

CFMOTO responds that at the time that Mirman executed the Customs POA, Bjork did not provide Mirman with a copy of any terms and conditions. (Second Mirman Aff., Docket No. 29, ¶ 5.) CFMOTO argues that to the extent that any terms governed the parties' business relationship, NNR's Import Proposal (the "Import Proposal"), which NNR provided to CFMOTO prior to the time Mirman executed the Customs POA, supplied those terms. That proposal outlined NNR's costs for logistics services. (*Id.*, Ex. A.) CFMOTO contends that the Import Proposal did not include a forum-selection provision.

The Court finds that the Customs POA and its accompanying terms and conditions supplied the terms governing the parties' business relationship. Although Mirman now asserts that he did not receive any terms and conditions when he signed the Customs POA, that after-the-fact assertion directly contradicts the evidence in the record. Indeed, Mirman concedes that he executed the Customs POA, which was entitled "Customs Power of Attorney and **Acknowledgement of Terms and Conditions of Service.**" (Docket No. 18, Ex. 2 (emphasis added); Second Mirman Aff., Docket No. 29, ¶ 5.) The Customs POA explicitly provided that Mirman "acknowledge[d] receipt of NNR's Terms and Conditions of Service governing all transactions between the Parties." (Docket No. 18, Ex. 2.) It is unclear why Mirman would sign the Customs POA and acknowledge receipt of the terms and conditions if he did not, in fact, receive a copy of the terms and conditions.[3] CFMOTO has not provided, and the Court cannot discern, a reasonable explanation for the presence of Mirman's signature and acknowledgement on the Customs POA if he did not actually receive the Terms and Conditions of Service. Accordingly, the Court concludes that CFMOTO and Mirman were aware of and

---

[3] CFMOTO also contends that the POA Terms and Conditions form does not "match-up" with the executed Customs POA, pointing out that the executed Customs POA lacks an NNR logo, lacks an IRS Tax Identification number, and has additional language at the bottom of the document that is included on the submitted terms and conditions. NNR explains that an exact duplicate of the terms and conditions that it provided to Mirman is not available because NNR ceased using a vendor to print those forms and destroyed the remaining forms. NNR further contends that the substance of the terms and conditions is exactly the same. Notably, the terms and conditions in both forms, as well as the reverse sides of the invoices, are the same. (*Compare* Docket No. 18, Ex. 1 *with* Docket No. 19, Ex. 4.) Under these circumstances, the Court credits NNR's explanation of the difference in forms and finds no reason to doubt the credibility of its submissions.

assented to the forum-selection clause in the Terms and Conditions of Service when Mirman signed the Customs POA.

The Court also notes that NNR's Import Proposal did not supply any terms governing the parties' business arrangement. The Import Proposal was merely an offer or invitation to deal, and did not constitute a contract. It provides only "general terms and conditions," does not have a place for assent or signature, does not supply terms apart from general services or price quotes, and indicates that its price terms were subject to change. (Docket No. 29, Ex. A.) As a result, the Court concludes that the Import Proposal was provided for informational purposes and did not constitute the parties' contract or agreement. *See Litton Microwave Cooking Prods. v. Leviton Mfg. Co., Inc.*, 15 F.3d 790, 794 (8th Cir. 1994) (applying Minnesota law and concluding that "price quotes and catalogs generally are not offers to form a contract"); *see also Nordyne, Inc. v. Int'l Controls & Measurements Corp.*, 262 F.3d 843, 846 (8th Cir. 2001) ("The general rule is that a price quotation, such as one appearing in a catalogue or on a flyer, is not an offer, but is rather a suggestion to induce offers by others.").

> **B. In the Alternative, The Forum-Selection Clause Became a Part of the Parties' Agreement Under the 224 NNR Invoices that NNR Sent to CFMOTO.**

In connection with the transactions between NNR and CFMOTO from April 2008 through July 2009, NNR submitted a total of 224 invoices to CFMOTO for payment of freight, domestic transportation, and warehousing expenses. The forum-selection clause was included on the reverse side of each of those invoices. (*See e.g.*, Hutzenbuhler Decl.,

Docket No. 19, Exs. 3, 4.) CFMOTO does not dispute that the forum-selection clause excerpted above was printed on the reverse side of the invoices. Rather, CFMOTO contends that the forum-selection clause in the invoices never became a part of the parties' agreement because it materially altered the terms to which the parties originally agreed. Even setting aside the Court's conclusion that the forum-selection clause in the Customs POA governed NNR and CFMOTO's business relationship, the Court concludes in the alternative that the forum-selection clause would have become a part of the parties' agreement because NNR provided it to CFMOTO 224 times in its invoices.

The Eighth Circuit has held that forum-selection clauses included on invoices submitted between merchants may become a term in the parties' agreements through their course of dealing.[4] *See, e.g. Nordyne*, 262 F.3d at 846-47. The Eighth Circuit has also held that in considering whether newly introduced terms materially alter an agreement and therefore do not become a part of the parties' agreement, "[c]onsiderations of surprise and hardship must remain part of the analysis." *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 910 (8th Cir. 2005) (internal quotation marks and alteration omitted). CFMOTO argues that the forum-selection clause constitutes surprise because the parties did not negotiate the provision and the forum-selection clause "simply appeared on the back of NNR invoices." (Mem. in Opp'n to Mot. to Dismiss, Docket

---

[4] Although CFMOTO alludes to an argument regarding a "battle of the forms" under the Uniform Commercial Code ("UCC"), the parties do not substantively argue whether the UCC, which applies to sales of goods, or the common law, which applies to the sale of services, should govern here. Here, the Court's opinion is premised on the arguments advanced by the parties at the hearing and in the briefing submitted by the parties. The Court offers no conclusions at this stage of the litigation regarding which substantive law applies.

No. 28 at 9.) Moreover, CFMOTO argues that the forum-selection clause requires CFMOTO to litigate in a "distant forum," creating significant financial hardship and a "logistics nightmare."

The Court finds unavailing any argument that the forum-selection clause constituted surprise. As noted above, Mirman signed the Customs POA acknowledging receipt of NNR's Terms and Conditions of Service. Even if the Court accepted CFMOTO's contention that Mirman did not receive any terms and conditions at that time, Mirman, a sophisticated businessman, would have understood through his acknowledgement of receipt of the terms and conditions that there were additional terms governing the relationship. Here, the terms and conditions were provided on the reverse side of 224 invoices that were sent to NNR between April 2008 and July 2009.[5] CFMOTO never objected to the terms and conditions on the reverse side of the invoices, even as it paid a majority of those invoices and concedes that it is responsible for paying the remaining invoices.

CFMOTO also argues that enforcing the forum-selection provision would cause CFMOTO hardship and should therefore not be considered part of the parties' agreement. (Mem. in Opp'n to Mot. to Dismiss, Docket No. 16 at 9.) CFMOTO's hardship argument, however, is not persuasive. CFMOTO contends that access to evidence and to reasonable discovery methods "would not be a problem in the Minnesota litigation," but

---

[5] Indeed, the front of the freight invoices stated, "NNR handles shipments subject to the terms and conditions set forth on the reverse side of this invoice." (Hutzenbuehler Decl., Docket No. 19, Ex. 3.)

that litigation in Illinois "creates a logistics nightmare for witnesses."[6] (Mem. in Opp'n to Mot. to Dismiss, Docket No. 16 at 9.) CFMOTO's bald assertion that litigation in Illinois would cause a "logistics nightmare," without more, does not demonstrate that the forum-selection clause included on the reverse side of the invoices would work a hardship on CFMOTO.

Accordingly, the Court finds that under the Terms and Conditions of Service accompanying the Customs POA and, in the alternative, on the reverse side of the invoices to CFMOTO, the forum-selection clause was a term of the parties' agreements.

### C. The Forum-Selection Clause Is Not Unjust or Unreasonable.

"Forum selection clauses are prima facie valid and are enforced unless they are unjust or unreasonable or invalid for reasons such as fraud or overreaching."[7] *M.B. Rests., Inc. v. CKE Rests., Inc.*, 183 F.3d 750, 752 (8th Cir. 1999) (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). "[I]nconvenience to a party is an insufficient basis to defeat an otherwise enforceable forum selection clause." *Id.* at 753.

CFMOTO's unreasonableness argument mirrors its hardship argument regarding the terms on the reverse side of the 224 invoices. That is, CFMOTO argues that litigating

---

[6] CFMOTO argues both the "hardship" prong of the material alteration analysis and the "unreasonableness" of the forum-selection clause in the same section. (Mem. in Opp'n to Mot. to Dismiss, Docket No. 16 at 9.) CFMOTO's assertions, however, fail to demonstrate either hardship or unreasonableness for these purposes.

[7] The Eighth Circuit has not determined whether interpreting a forum-selection clause is a procedural question to be decided under federal law or a substantive question to be decided under state law. *M.B. Rests.*, 183 F.3d at 752. Here, the parties do not argue that the Minnesota and federal standards differ.

in Chicago, Illinois, as opposed to Minneapolis, Minnesota, would be inconvenient and would cause CFMOTO "significant financial hardship." (Mem. in Opp'n to Mot. to Dismiss, Docket No. 16 at 9.) Even if the Court accepted CFMOTO's argument that litigating this dispute in Chicago would be inconvenient or more costly, those facts, alone, are insufficient to defeat a forum-selection clause. *See M.B. Rests.*, 183 F.3d at 753. In addition, CFMOTO's assertion that it will effectively be deprived of its day in court if the forum-selection clause is enforced is not persuasive. *Cf. McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 346 (8th Cir. 1985) ("We thus take judicial notice that litigation of the dispute in the courts of Iran would, at the present time, be so gravely difficult and inconvenient that McDonnell Douglas would for all practicable purposes be deprived of its day in court."). Indeed, as noted below, the Court will transfer this case to the Northern District of Illinois, where CFMOTO may pursue its claims and sought-after relief.

The forum-selection clause provided in the Terms and Conditions of Service and the NNR invoices is not unjust or unreasonable and should be enforced here. *See Nordyne*, 262 F.3d at 846, 847-48 (finding that a forum-selection clause on the back of invoices was enforceable based on course of dealing).

## II. TRANSFER

Although NNR originally moved to dismiss the case for improper venue, NNR requests in the alternative that the Court transfer the case to the Northern District of Illinois, Eastern Division. (Reply Mem., Docket No. 31 at 15.) In these circumstances,

the Court agrees that transfer under 28 U.S.C. § 1404(a) is appropriate. *See* 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."); *cf. Digital Envoy, Inc. v. Google, Inc.*, 319 F. Supp. 2d 1377, 1379 (N.D. Ga. 2004) (holding that transfer may be an appropriate procedural mechanism to enforce a forum-selection clause).

Because the Court concludes that transfer to the United States District Court for the Northern District of Illinois is appropriate, it declines to address CFMOTO's request for preliminary injunctive relief. Accordingly, the Court denies without prejudice CFMOTO's motion in deference to the Northern District of Illinois Court. Normally, the Court would dissolve a temporary order upon the transfer of a case in order to permit the transferee court to address the dispute on a clean slate. However, the Court believes that the stipulated Temporary Restraining Order entered by this Court (see Docket No. 22) has preserved the status quo and permitted the parties to continue a limited, but necessary business relationship. Continuation of this Order remains in the interest of justice, and the Court orders that the Temporary Restraining Order will remain in effect until further order in the transferee court.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. NNR's Motion to Dismiss for Improper Venue [Docket No. 7] is **GRANTED** to the extent that NNR requests that the Court transfer the case based on improper venue. The Court **DIRECTS** the clerk's office to transfer Case No. 09-cv-2202, *CFMOTO Powersports Inc. v. NNR Global Logistics USA, Inc.*, to the United States District Court for the Northern District of Illinois, Eastern Division. The Court **DENIES** NNR's motion to the extent it seeks dismissal of the case.

2. CFMOTO's Motion for Preliminary Injunction [Docket No. 2] is **DENIED without prejudice**. The Court **ORDERS** that the terms of the Temporary Restraining Order [Docket No. 22] remain in effect until further adjudication by the transferee court.

DATED: December 4, 2009
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____
JOHN R. TUNHEIM
United States District Judge